UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

WAYNE FRAZIER,

    Debtor.
_____/

HOWARD MILLER and
JEAN MILLER,

    Plaintiffs/Counter-Defendants,

v.

WAYNE FRAZIER,

    Defendant/Counter-Plaintiff.
_____/

Case No. 09-20032-dob
Chapter 7 Proceeding
Hon. Daniel Opperman

Adv. Proc. No. 09-2183-dob

## TRIAL OPINION

Plaintiffs, Howard Miller and Jean Miller, filed a Complaint to determine the dischargeability of an obligation owed by Defendant, Wayne Frazier. The parties submitted this matter to the Court on briefs and exhibits after the Court granted partial summary judgment in favor of Plaintiffs in the amount of $80,501.00 via Order dated October 18, 2011. The remaining amounts of $57,737.00 in lost profits, $43,147.00 due and owing on certain promissory notes, and $22,296.00 for a loan, remains to be decided. For the reasons stated in this Opinion, the Court determines that these amounts are excepted from discharge pursuant to 11 U.S.C. § 523.

### Introduction

Wayne Frazier ("Defendant") filed his Chapter 13 bankruptcy petition on January 8,

1

2009. His case was converted to Chapter 11 on May 19, 2009, and to Chapter 7 on September 24, 2009. Howard and Jean Miller ("Plaintiffs") are unsecured judgment creditors of Defendant. Plaintiffs filed an adversary complaint seeking to have the debt owed to them held nondischargeable under 11 U.S.C. § 523(a)(2), 523(a)(4), and 523(a)(6), claiming that the entirety of the debt arose from the fraudulent acts of Defendant, despite the amount being apportioned under differing legal theories. Plaintiffs filed a Motion for Summary Judgment on March 2, 2011. A hearing on that Motion was held on April 22, 2011.

At the hearing on their Motion, Plaintiffs argued that the entire debt should be deemed nondischargeable due to misrepresentations by Defendant. The judgment debt in this case arose from a state court case dating back to July 27, 2007, when Plaintiffs filed their Complaint in the original cause of action. After reviewing the oral arguments held in the Michigan Court of Appeals for that case, this Court issued an Opinion on September 29, 2011, Granting Partial Summary Judgment in the amount of $80,501.00, which was the amount awarded to the Plaintiffs in the state court case for their Fraud and Misrepresentation count. This Court, while concluding that it needed to respect the logic of the state court judge's opinion, which allocated the award under differing legal theories, did not grant summary judgment on the entire amount because issues of fact remained. In lieu of an actual trial of the remaining amounts at issue, the parties requested that this Court would review the state court trial testimony. This Court bases its Opinion on the state court record and the arguments of counsel.

Findings of Fact

Defendant, together with Plaintiffs, started J & W Transportation LLC ("J&W'), a trucking company, on August 27, 2001. Though it operated without an operating agreement for

several years, one was created in 2004 and was backdated to be effective from the time of formation in 2001. Under the terms of the agreement, both Howard and Jean Miller possessed a 25% interest in the company, and Defendant possessed a 50% interest in the company. Howard Miller acted as a silent partner, while Jean Miller managed the company's finances and books, and Defendant drove trucks for J&W and maintained control of employees and maintenance. All three parties made contributions toward the startup of the company; Defendant contributed two trucks, valued at $10,000 each, and Plaintiffs contributed $20,000 in cash. While Defendant never signed the operating agreement directly, his signature was affixed to the document with a stamp that he had purchased. According to Jean Miller's testimony, Defendant specifically authorized her to affix his signature with the stamp to the operating statement; however, Defendant contests this testimony.

On or about the same date that the original operating agreement was drafted, the three parties implemented an amendment to the operating agreement in which Plaintiffs each transferred a half percent interest point to Defendant. In doing so, this made Defendant the majority owner, as he then had a 51% interest. The reason for the transfer was that J&W was considering growth opportunities and was hoping to acquire minority status by using Defendant's Hispanic heritage. Receiving minority status would have spurred growth by allowing J&W to obtain additional contracts. However, J&W was deprived of minority status in June, 2006 because Defendant, who was the only minority member of the business, was not the person handling the company's finances. Defendant was granted minority status with WL Frazier Trucking, LLC, ("WL Frazier"), another trucking company he had formed in December of 2005. J&W provided startup costs for WL Frazier in the amount of $22,296.00. Through the

procurement of minority status, Defendant was able to gain contracts with two companies doing business as Mason Dixon and Dallas Mavis.

In the course of its business and prior to the time it provided the startup costs for WL Frazier, J&W bought up to 12 trucks. At least three of these trucks, together with other operating expenses and cash, were secured by a Standard Federal equity line of credit on the Plaintiffs' home. In August of 2003, Plaintiffs sold their home in order to pay the balance on the equity line. At that time the balance was $95,464.50. Defendant does not dispute that this credit line was used to fund J&W. In order for J&W to repay the loan, a promissory note was drafted setting monthly installments of $1,440.00 with eight percent interest. Defendant admits knowing about the payments regarding the home equity credit line and made payments on the loan for a number of years, though he denies any knowledge of or consent to the promissory note or its terms. Tax returns for 2004, 2005, and 2006 all reflect the loan as being outstanding J&W debt. At the time of the state court proceedings, $43,147.00 was owed on this note.

At the time J&W was formed in 2001, Jean Miller had been employed with her family's trucking business, Total Transportation since 1985. Defendant, who was employed by Total Transportation as an owner operator, met Jean Miller at Total Transportation when she was working as a dispatcher. As a dispatcher, Jean Miller assigned loads to the many owner operators employed by Total Transportation. J&W entered into an operating agreement with Total Transportation and hauled loads for Total Transportation. After the formation of J&W, Jean Miller continued to both dispatch loads for Total Transportation and maintain the financial records for J&W until August of 2006, when she decided to resign from Total Transportation. It was also in August of 2006 that Mark Wenglikowski, Jean Miller's brother and the Vice President of Total Transportation,

4

terminated all 12 of the leases on J&W trucks. Though J&W obtained roughly 99 percent of its business through Total Transportation, both Jean Miller and Mark Wenglikowski testified that neither the termination of the leases or Jean Miller's resignation was impacted in any way by Jean Miller's ownership interest in J&W. Mark Wenglikowski testified that Defendant's conduct caused him to feel that Defendant was unreliable and that the termination of the leases was to protect customers from having to deal with such issues. Jean Miller cited her desire to work for Defendant as her reason for resigning. She was hired to do full time work at WL Frazier after she resigned from Total Transportation.

Although J&W and WL Frazier were independent companies, Plaintiffs and Defendant discussed how the two companies might work together for their mutual benefit. After getting minority status for WL Frazier, Defendant claimed this would mean increased business and made representations to the Plaintiffs that WL Frazier would go "hand in hand" with J&W. By November 1, 2006, WL Frazier possessed all 12 J&W trucks, which comprised all but one of WL Frazier total fleet. Plaintiffs and Defendant agreed that the J&W trucks would run through WL Frazier and that the two companies would share any profit resulting from the generation of income. In addition to the 12 trucks and the $22,296.00 in startup expenses, Howard Miller also loaned WL Frazier an additional $50,000.00 based on Defendant's representation that J&W, and therefore the Plaintiffs, would benefit from WL Frazier's use of the J&W trucks and its minority status. Due to the requirements for the minority status, all parties acknowledge that Defendant never intended to provide ownership interest in WL Frazier to the Plaintiffs, however, Plaintiffs testified that Defendant made representations that there would be a "side deal" off the books in which Plaintiffs would benefit in profits from WL Frazier. Plaintiffs further testified that they would not have let

5

WL Frazier use the 12 truck units had they not believed that they would receive compensation for the use of those units. WL Frazier never bought those units and failed to enter into a formal lease for them. It was understood among the parties that the trucks would remain J&W property, but be used by WL Frazier. Defendant also agreed to become personally liable on the $50,000.00 WL Frazier debt by personally signing a promissory note on that debt. The remaining amount of $41,490.00 on that note was part of the total determined to be nondischargeable as part of this Court's previous Opinion Granting Partial Summary Judgment.[1]

Jean Miller's employment with WL Frazier ended on December 6, 2006. As severance, Jean Miller received pay in the form of two months' salary. WL Frazier also provided her with a check in the amount of $21,826.00 for outstanding credit card debt. Plaintiffs are not seeking to recover any of the debt that was paid off by this check. By this time, Jean Miller was no longer employed with J&W either, leaving Defendant in complete control of both companies. While Defendant did initially continue to make some payments towards outstanding J&W obligations, no payments were made after May, 2007.

In May of 2007, Plaintiffs, through counsel, sent a formal demand to Defendant to either return the trucks to J&W or enter into a written lease agreement. The trucks were never returned and a lease agreement was not signed. Defendant continued to use J&W trucks despite court orders. On October 11, 2007, ten of the twelve trucks owned by J&W were sold for $80,000.00. The remaining two trucks were not sold, as Defendant claimed that they were inoperable. One of those two trucks was scrapped and sold for parts. The other truck, Truck 4234, remained in the possession

---

[1] The total $80,501.00 determined to be nondischargeable in this Court's September 29, 2011, Opinion was also comprised of $39,011.00, "to reimburse for credit card expenses" pursuant to the state court complaint, "Count II, Fraud and Misrepresentation."

6

of Defendant, and according to statements from Dallas Mavis and Mason Dixon, Defendant continued to operate it after the date of sale, traveling on an interstate route in both October, 2007 and May, 2008. Defendant did not compensate Plaintiffs for this use and he kept it in direct opposition to the state court order which compelled Defendant to return all of the trucks. The use of the truck to ship loads generated $19,744.00 from Dallas Mavis and $3,122.00 from Mason Dixon. The inappropriate use of this unit in violation of the court order eventually led to Defendant being held in contempt of court and the income generated from the use was awarded to the Plaintiffs in the state court's computation of lost profits. The Plaintiffs were awarded $57,737.00 in lost profit damages the state court found were due to Defendant's false representations to Plaintiffs because Defendant was unjustly enriched as a result of his conduct. The determination of this amount was based upon J&W's earlier tax returns.

<u>Arguments</u>

Plaintiffs argue that Defendant's debt should not be discharged under 11 U.S.C. § 523(a)(2)(A) because it was it was obtained by "false pretenses, a false representation, or actual fraud[.]" Defendant claims that the Plaintiffs have failed to prove the elements set forth in *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir. 1998): "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *Id.* at 280-81. Defendant contends that the Plaintiffs failed to prove the first element and that he did not obtain any money through material misrepresentation. Defendant also contends that the Plaintiffs also failed to prove the second element, and that he

7

did not intend to deceive the Plaintiffs with his representations, specifically that the Plaintiffs provided no evidence that the promissory note for $50,000.00 was a fraudulent misrepresentation. Defendant further contends that Plaintiffs did not justifiably rely on his representations and have thus failed to establish the presence of the third element. Defendant maintains that there was no expectation that Plaintiffs would provide funding for WL Frazier and that Plaintiffs did not provide any evidence that Defendant asked them to do so. Defendant claims that Plaintiffs' alleged reliance was not the proximate cause of any loss. Defendant points to other factors, such as J&W losing its leases with Total Transportation and Jean Miller's separation of employment with Total Transportation, as additional reasons for any losses suffered and that the lost profits are speculative. In addition, Defendant argues that it is his belief that any and all amounts owed to Plaintiffs have already been paid in full and that the state court overlooked monies already paid to Plaintiffs.

Plaintiffs further argue that Defendants debt should be deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(6) because Defendant's conduct was willful and malicious and injured Plaintiffs. Plaintiffs claim that proof of this conduct is evident if the debtor "believes that consequences are substantially certain to result from it." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). Defendant argues that 11 U.S.C. § 523(a)(6) is inapplicable because he did not have the will or desire to cause harm, nor did he have reason to believe that his actions would cause injury or harm to the Plaintiffs.

Statement of Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

## Applicable Law

### Standard of Review

A preponderance of the evidence standard is applicable to all dischargeability proceedings pursuant to Section 523(a), including those involving fraud. *Grogan v. Garner*, 498 U.S. 279 (1991).

### 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code wholly precludes the discharge of any obligation resulting from fraud. *Cohen v. de la Cruz*, 523 U.S. 213 (1998). In fact, "[t]he Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *Id.* at 217. The Plaintiffs argue for a reading of Section 523(a)(2)(A) as that found in both *Building Commc'ns., Inc. v. Rahaim (In re Rahaim)*, 324 B.R. 29 (Bankr. E.D. Mich. 2005), and in *Rembert*, and while courts traditionally require a creditor to establish the elements spelled out in those cases, the Supreme Court of the United States has held that "[t]he most straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any debt' respecting 'money, property, services, or ... credit' that the debtor has fraudulently obtained, including treble damages assessed on account of the fraud." *Cohen*, 523 U.S. at 218. Furthermore, the Court has added that "[o]nce it is established that specific money or property

9

has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge ." *Id.*

11 U.S.C. § 523(a)(6)

"Section 523(a) defines several categories of liabilities that are excepted from discharge[.]" *Cohen*, 523 U.S. at 219. As with § 523(a)(2)(A), the language in § 523(a)(6) introduces one of those categories of nondischargeable debt. As the Plaintiffs point out, to prove a Section 523(a)(6) exception for willful and malicious injury, a debt need be for an injury that is together willful and malicious. *Markowitz*, 190 F.3d, at 463. Moreover, only actions performed with intention to cause an injury, and not simply acts performed intentionally, reach the level of willful and malicious injury for the purpose of satisfying Section 523(a)(6). *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576 (6th Cir. 2001); e.*g., Kawaauhau v. Geiger*, 523 U.S. 57 (1998) (debt resulting from medical malpractice based on negligence or recklessness found not to fall within willful and malicious under Section 523(a)(6) and held dischargeable).

Analysis

Although the state court did allocate the award under differing legal theories, a careful reading of that opinion reveals profuse evidence that the state court concluded that the debts at issue in this case stemmed from the fraudulent misrepresentations and willful and malicious conduct of Defendant, and that all of the elements of the various categories of nondischargeable debt under Section 523(a) are met. From the very outset of the opinion, the court said it "[found] specifically that the credibility of Mrs. Miller far exceeds that of Mr. Frazier." *J&W Transportation, LLC, et al. v. Frazier, et al.*, No. 07-5987-CB, at 2 (21st Cir. Ct. October 23, 2008). The $80,501.00 awarded by the state court under a theory of fraud and misrepresentation included $41,490.00, the amount remaining due at that time on the $50,000.00 loan by Howard Miller to Defendant, and $39,011.00, the total amount of Plaintiffs' credit card debt used to

11

support J&W. Neither of these amounts includes the $22,296.00 in startup funds received by WL Frazier from J&W, even though the court discussed those funds in its analysis of fraud and misrepresentation and acknowledged that this amount was still outstanding. In its findings of fact, the court stated: "J&W provided start up costs to WL Frazier in the amount of $22,296.00, which continues to be outstanding. WL Frazier was subsequently granted minority status. By obtaining minority status, Mr. Frazier was able to obtain contracts with Mason Dixon and Dallas Mavis." *Id.* at 3. In its analysis of fraud and misrepresentation it stated that, "[t]his Court finds that Mr. Frazier promised the Millers that operation of WL Frazier would benefit J&W." *Id.* at 9. Further, the court went on to state that, "Mr. Frazier knew that if he guaranteed the Millers a part of WL Frazier profits that they would rely on his representation. Mr. Frazier was in need of start up capital and operating expenses." *Id.* at 10. The state court further added:

> **Mr. Frazier may not have offered a percentage of partnership interest to the Millers but he did promise that J&W and WL Frazier would work together to produce income for both businesses and that the Millers would have an interest in the profits generated by WL Frazier. The Millers were not given actual stock in WL Frazier in order to allow WL Frazier to operate as a minority company. Mr. Frazier knew when he told the Millers that they would have an interest in WL Frazier profits and that the businesses would be ran together for profit that this was not true. Mr. Frazier has stated that he never intended on giving the Millers an interest in WL Frazier and that he started the business to protect his own personal assets.**

*Id.* at 9-10.

Under the state court's analysis, this Court concludes that all of the factors from *Rembert* are met as to the $22,296.00 in start up funds. Defendant obtained money through a material representation he knew was false; Defendant intended to deceive the Plaintiffs; Plaintiffs

12

justifiably relied on the false representation; and the reliance was the proximate cause of Plaintiff's loss.

A similar analysis can be used regarding the lost profits of $57,737.00. The state court stated in its analysis of unjust enrichment that "Defendants received the benefit of using trucks belonging to J&W and generating profit therefrom." In concluding it also stated: "This court finds that the Plaintiffs Millers are entitled to $57,737.00 for lost profits[.]" *Id.* at 12. Knowing that Defendant falsely represented that the Plaintiffs would have an interest in the profits generated by WL Frazier, and knowing that the Plaintiffs testified that they would never have permitted Defendant to use the trucks without the promise of these future benefits, the Court concludes that again all the factors from *Rembert* are met as they relate to the lost profits. Again, Defendant obtained money–the lost profits–through a material misrepresentation he knew was false; Defendant intended to deceive the Plaintiffs by making the representation but never intending to give the Plaintiffs an interest in the lost profits; Plaintiffs justifiably relied on the false representation by providing Defendant with the trucks; and the reliance was the proximate cause of Plaintiffs' loss because they could have used the trucks themselves to generate such profit.

The Court notes, as the Plaintiffs do in their reply brief, that the state court determined that Defendant made fraudulent misrepresentations. This determination was affirmed by the Michigan Court of Appeals and was then also found, in granting partial summary judgment, by this Court. Defendant, in his trial brief in response to Plaintiffs' trial brief, does not directly address how these debts do not fall under the provisions of the Code as argued by the Plaintiffs, and why they should be discharged. Defendant simply advances the same arguments that he

13

made at the state trial court level and on appeal, and in doing so, questions the credibility of the state court's findings. Much of the Defendant's argument is based on his own testimony, which the state court found to be far less credible than that of the Plaintiffs. Defendant also attacks Plaintiffs' character by accusing at least one of them of unlawful acts for which they have not been charged. With this record, this Court sees no reason to question the findings of the state court and reaches the same conclusions regardless.

Further, Defendant argues that the lost profit calculations are merely speculative because the Plaintiffs did not provide testimony from an expert. Plaintiffs offered the testimony of Jean Miller, who had approximately twenty years of experience in the trucking industry. Her family was heavily involved in that industry, and she dealt with the financials of the business on multiple occasions and, according to the state court, she managed a successful business . While Defendant testified that these calculations were very liberal, the state court concluded that they were an appropriate amount as to what the estimated profit would be. Again, this Court concludes that ample credible evidence exists to support Plaintiffs' damages.

As for the $43,147.00 outstanding balance on the home credit line promissory note, the Court concludes that such is nondischargeable under Section 523(a)(6). Even if Defendant did not desire harm at the time the debt was incurred, the Court concludes that Defendant must have believed that the injury was substantially certain to occur as a result of his behavior. Despite Defendant's contentions that he had no knowledge of the promissory note on the home credit line and that he never authorized the use of the stamp to affix his signature to the note, the state trial court determined that, "Mr. Frazier confirmed that he had knowledge of the agreement and payments being made when he continued to make payments on the loan. The 2004, 2005, and

2006 tax returns also reflect the loan as an outstanding debt for J&W. Currently, $43,147.00 remains due on this note." *Id.* at 3. Defendant knew that if none of the profits from WL Frazier went to J&W, that J&W would not be able to make the payments on the loan since the trucks were being used solely by WL Frazier and were not leased anywhere else for work. This is especially true after Defendant stopped making payments on the note and when, as the state court points out, "Mr. Frazier continued to use the trucks despite the lack of a contract governing their use and Plaintiffs demanded their return or payment." *Id.* at 12. Defendant , in his own testimony said he never intended to provide interest or profits from WL Frazier to the Plaintiffs. This fact, coupled with the state court's findings, demonstrates that the conduct was willful and malicious. Under its analysis of claim and delivery, the state court stated that, "[t]his Court finds that the unlawful detention began when Plaintiffs demanded that the trucks be returned or a lease agreement entered. Defendants did not return the vehicles or enter into a lease agreement." *Id.* at 8. The state court then went on to find:

> **At this time, Defendants began to possess the trucks without Plaintiffs' permission. He retained possession not for the benefit of J&W, but for the benefit of WL Frazier or himself. Plaintiffs suffered damages as a result because the trucks were being used without compensation to J&W and for the benefit of Defendant personally or his LLC. J&W was not able to pay bills or use the trucks to obtain its own business while they were being used by WL Frazier.**

*Id*.

Further evidence that Defendant's conduct was willful and malicious can be found in Defendant's failure to comply with a court order to return all of the trucks, and the subsequent charge of criminal contempt against him. Moreover, the state court found that the Defendant had committed both common law and statutory conversion: "Defendants began wrongfully possessing the trucks when Plaintiffs sent a demand letter requesting either the return of the

15

trucks or payment for their use." *Id.* at 13. The state court clearly concluded that it "does find that Mr. Frazier's conduct is so **willful and wanton** that it demonstrates a reckless disregard for the rights of Plaintiffs." *Id.* at 14 (emphasis added). Again, there is no basis to question the state court's conclusions, and this Court makes the same factual findings, with the conclusion that Defendant's debts to Plaintiffs are excepted from discharge.

Because the Court concludes that the total remaining debt is nondischargeable it need not further examine the Section 523(a)(4) arguments raised by Plaintiffs.

Conclusion

For these reasons, the Court concludes that the remaining amounts claimed by Plaintiffs–$57,737.00 for lost profits, $43,147.00 for the outstanding balance on the promissory note for the home equity line of credit, and $22,296.00 for WL Frazier's startup costs–are nondischargeable. Specifically, the $22,296.00 for start up costs and the $57,737.00 in lost profits are nondischargeable due to Defendant's fraudulent misrepresentations pursuant to Section 523(a)(2)(A). The $43,147.00 for the outstanding balance on the promissory note is nondischargeable based on willful and malicious conduct under Section 523(a)(6).

Defendant claims that he has already paid Plaintiffs in full and that the state court did not give him credit for these payments. This court did not see evidence of payments as claimed by Defendant, so Plaintiffs may have a judgment that the debts owed to them are excepted from discharge. Defendant may submit written proof of payment to Plaintiffs and if appropriate, this court will credit Defendants with these amounts. Defendant shall submit the necessary proofs within twenty eight (28) days of entry of the order consistent with this Opinion.

Plaintiffs shall prepare and submit an appropriate order.

**Not for publication**

```
Signed on August 08, 2012
                                        /s/ Daniel S. Opperman
                                      Daniel S. Opperman
                                      United States Bankruptcy Judge
```